I. OAKFORD ACTON, administrator of the estate of DAVID WARE, deceased,

*v.*

RICHARD WADDINGTON and wife.

1. Where land is conveyed, and the purchase-money for it is not paid, and no distinct security for the purchase-money is taken in its stead, a constructive trust arises, and the vendee is considered as the trustee of the land for the

Acton *v.* Waddington.

vendor until the purchase-money is paid, and the vendor thus obtains an equitable lien upon the land.

2. The vendor's lien is good against the vendee and his heirs, and all persons taking from them as volunteers, and also against purchasers for value who have notice that the purchase-money is unpaid.

3. The taking of a personal undertaking from the vendee to pay the purchase-money, such as his bond, note or covenant, unless it appears that it was intended to be substituted for the purchase-money, or to be the thing in fact bargained for, will not destroy the lien.

4. The lien will continue as long as an action can be maintained for the recovery of the purchase-money.

5. A wife sold land in 1826, taking her grantee's bond for part of the purchase-money, payable upon the death of a third person, M. H. In 1837 the grantee made a bond to the wife's husband, which was a copy of the wife's bond, except in the date and name of the obligee. The bond to the wife disappeared. The husband died in 1839, and thereafter his bond, in the hands of his wife, was treated by her and her grantees, and their assigns, as representing the purchase-money debt, until M. H. died in 1872. The wife and her grantees are dead.—*Held,* that the husband's bond must be taken as representing the purchase-money debt, and that a lien will be declared for the amount due upon it in favor of his administrator.

On bill, answer, replication and proofs.

Ann Hall died in the month of January, 1820, testate. Her will was admitted to probate by the surrogate of Salem county on the 26th day of that month. By that will she devised the farm of which she died seized to seven of her children—Margaret (who was then the wife of John Den), Rebecca (who was the wife of David Ware), William, Ann, Edward, James and Hannah—and provided that her eighth child, a daughter, Martha, who was blind and feeble-minded, should be paid $175 a year out of the profits of the farm. In 1821 this property was partitioned among the devisees, and a portion of it, called " Plot No. 1," containing sixteen acres, was set off to Rebecca Ware. On the 30th of March, 1826, Rebecca Ware and her husband joined with the owners of the other shares of the farm in conveying the farm to Joseph and Job Black. This conveyance was expressly made subject to the " claim " of Martha Hall in the land, and recites that it was in consideration of $6,000 to the grantors in hand well and truly paid. On the day fol-

lowing, Joseph and Job Black made several bonds, by which they obligated themselves to pay to the several vendors of the farm certain sums of money upon the death of Martha Hall, and in the meantime to pay interest upon those moneys. Among the bonds thus given was one to Rebecca Ware, conditioned for the payment of $400 to her upon the death of Martha Hall. On the 28th day of May, 1847, Job Black conveyed his undivided half-interest in the farm to his brother, Joseph Black, and on the 23d day of March, 1849, Joseph Black conveyed the farm to the defendant Richard Waddington by deed, in which he covenanted that he had, using the language of the deed,

"Not done or suffered to be done any act or thing whereby the premises aforesaid are encumbered in title, saving and excepting one annuity bond given to William Hall for $800, one to Rebecca Ware for $400, one to John Den for $400, one to Hannah Hall for $400, amounting altogether to $2,000 given by Joseph and Job Black March 31, 1826, payable with interest on the day of the death of Martha Hall, daughter of Joseph and Ann Hall, and which still remain in force; but that the same are conveyed to the party of the second part, his heirs and assigns, as freely and clearly as they were vested in the said party of the first part, his heirs and assigns."

As to the bonds here mentioned, the defendant Richard Waddington testified as follows:

"There was an arrangement made between Black and me that a portion of the purchase-money should not be paid on the delivering of the deed; he said that he had given bonds for part of the money when he bought the farm, him and Job, his brother; I think he mentioned it to me before I purchased the property; I think he did, if I am not mistaken; I know he did afterwards; I think I had agreed with him as to the purchase before he mentioned it; I gave Joseph Black my bonds for $2,800; that was money that he had given, bonds that he and Job had given in part payment for the farm."

Upon cross-examination he said:

"Joseph Black said that he and Job had given their bonds for the $2,800, and that he wanted me to pay that money; I think he said this money was due at the death of Martha Hall, and he could not pay it before, and had given bonds to that effect; he said to me that at the death of Martha Hall the money was due to the heirs to whom he had given the seven bonds, he and Job; if I heard the names called, I could tell them; I remember William

Hall, Edward Hall, Margaret Den (Edward Bilderback's widow represents her), Rebecca Ware, Hannah Orton, David Hall; William Hall and wife had two shares."

The complainant produced a bond from Joseph Black and Job Black to Hannah A. Hall, dated March 31st, 1826, in the penal sum of $800, conditioned for the payment of $400 on the day of the death of Martha Hall, daughter of Joseph Hall and Ann Hall, with interest for the same payable every 25th day of March thereafter, which interest had been paid by Richard Waddington, and also a bond from Joseph Black and Job Black to David Ware, dated March 31st, 1837, in the penal sum of $800, conditioned for the payment of $400 on the day of the death of Martha Hall, daughter of Joseph Hall and Ann Hall, with interest payable on the 25th day of March annually. These bonds are drawn upon the same printed blanks, and evidently by the same hand. The scrivener, who is dead, appears to have been the subscribing witness to both bonds.

It is proved that both of the Blacks are dead, and that all their grantors have died. David Ware, the husband of Rebecca Hall, died in 1839. The bond to him went into the possession of his wife, and she held it until her death in 1871. Her daughter held it until after the death of Martha Hall in 1872, and subsequently it came to the hands of the complainant. No bond to Rebecca Ware has been found. After the death of David Ware, and possibly before that time, Martha Hall was in the custody of Rebecca Ware, and after Mrs. Ware's death her daughter cared for Martha until Martha's death. Martha's annuity, or the interest on the bonds, was annually paid to Rebecca Ware as long as she lived. Whenever this interest was paid after 1839, Mrs. Ware would receipt for $24 of it upon the above-mentioned bond to David Ware. Until 1856 the Blacks appear, by the receipts endorsed upon this bond, to have paid the interest, and after that the defendant Richard Waddington appears to have paid it. The body of nearly every receipt after that time is in Waddington's handwriting. After 1840 the receipts are, with one or two exceptions, signed by Mrs. Ware with her own name, Rebecca Ware. Richard Waddington testifies

that, after the death of Martha Hall, he paid George M. Ward, acting executor of Joseph Black's will, using his language, "the last money that I owed on the Joseph Black's bonds. It was stated to me that that would pay the shares of Rebecca Ware, Hannah's and the Bilderback, or Margaret Den, bond." And he produced a receipt, dated May 12th, 1873, signed by the executor, Ward, for $1,200, which was stated in the receipt to be the amount of three bonds of $400 each, given by Job and Joseph Black to Rebecca Ware, Margaret Den and Hannah Hall, "their shares which was reserved for the benefit of Martha Hall during her life." The executor, Ward, denied that he was ever paid for Rebecca Ware, but witnesses were produced to show that his reputation for truth was bad.

The bill seeks to have the amount due on the David Ware bond declared to be a vendor's lien upon the Ann Hall farm, now the property of the defendant Richard Waddington, and paid thereout.

*Mr. W. T. Hilliard,* for the complainant.

*Mr. M. P. Grey,* for the defendants.

THE CHANCELLOR.

It is well established in this court that where land is conveyed and the purchase-money for it is not paid, and no distinct security for the payment of that money is taken in its stead, a constructive trust arises, and the vendee is considered as the trustee of the land for the vendor until the purchase-money is paid. The vendor thus obtains an equitable lien upon the land for the purchase-money, which is good against the vendee and his heirs and all persons taking from them as volunteers, and also against purchasers from them for value with notice that the purchase-money is unpaid, and is unenforceable only against purchasers for value in good faith without such notice. *Crawford* v. *Bertholf, Sax. 458; Vandoren* v. *Todd, 2 Gr. Ch. 397; Brinkerhoff* v. *Vansciven, 3 Gr. Ch. 251; Herbert* v. *Scofield, 1 Stock. 492; Dudley* v. *Dickson, 1 McCart. 252; Arm-*

*strong* v. *Ross, 5 C. E. Gr. 109; Corlies* v. *Howland, 11 C. E. Gr. 311; Ledos* v. *Kupfrian, 1 Stew. Eq. 161; Ogden* v. *Thornton, 3 Stew. Eq. 569; Graves* v. *Coutant, 4 Stew. Eq. 763, 779; Porter* v. *Woodruff, 9 Stew. Eq. 174; Butterfield* v. *Okie, 9 Stew. Eq. 482.*

As has been indicated, that of which a *bona fide* purchaser for value must have notice to bind him to the lien, is the indebtedness of his vendor for the purchase-money, or a portion of it. *Brinkerhoff* v. *Vansciven, Armstrong* v. *Ross, Graves* v. *Coutant, supra.* The taking of some penal undertaking from the vendee to pay the purchase-money, such as his bond, note or covenant, unless it appears that it was intended to be substituted for the purchase-money or to be the thing in fact bargained for, will not destroy the lien. Such instruments will be considered as intended only to countervail the receipt for the purchase-money which may be contained in the deed, or to define the time and manner in which the payment is to be made, unless there be an express agreement between the parties to waive the equitable lien; but the lien will be considered as waived whenever any distinct and independent security is taken, such as a mortgage on the land, or pledge of things, or personal responsibility of third persons and the like. *1 Lead. Cas. Eq. 483.* "The pith of the rule," said Vice-Chancellor Van Fleet, in *Corlies* v. *Howland,* above cited, "is, there must be proof in the nature of the security accepted, evincing an intention by the vendor to waive the lien." As to the duration of the lien, Justice Scudder, in writing the opinion of the court of errors and appeals, in *Graves* v. *Coutant,* above cited, said (*p. 780*): "If this lien exists by the operation of a constructive trust, then I think it must be concurrent with it, and attach at the time the vendor obtains his right in the property, and it will continue so long as the trust remains, or, as some of the cases say, so long as an action can be maintained for its collection."

If it be assumed, for the purpose of the application of these principles, that the bond in question represents the bond to Rebecca Ware for the purchase-money, the lien claimed will clearly obtain. Purchase-money indisputably remained unpaid, and

the Rebecca Ware bond was clearly taken merely to fix the fact that money was due (thus countervailing the receipt contained in the deed), and to define a time of payment. When the defendant Richard Waddington purchased the farm, he had ample notice of all that was necessary to the preservation of the equity of Black's vendor in the land. The bond became payable in 1872, and within fifteen years thereafter this suit was brought upon it. I understand that if the case thus stood there would be no dispute as to the validity of the claim. Similarly situated bonds were paid by Waddington without question. The disputed point is, whether the bond now sought to be enforced represents the purchase-money for which the lien is claimed. All the parties to the bond are dead. Rebecca Ware is dead, and the scrivener who drew the bond is also dead. The Blacks are dead. It is now impossible, by direct testimony of witnesses, to prove the transaction in which the bond was produced, yet I think that established circumstances irresistibly fix its exact status. By the law as it existed in this State in 1837, the husband acquired an interest in all choses in action which came to his wife during coverture, and he might perfect such interest into complete title for his own use by any act which would reduce such property into his possession. He could sue for and recover, or release and assign, the debts due to his wife, and when such debts were recovered and brought into his possession, that fact itself was evidence of a conversion of the same to his own purposes, and the moneys thus became, as a general thing, absolutely his own. *Webster* v. *Horner, 4 Vr. 387;. 2 Kent Com. 136.*

It seems to be impossible, under the circumstances established here by the proofs, to escape the conviction that, the bond of Rebecca Ware was reduced by her husband, David, to his possession, and that in process of such reduction the bond here questioned was taken from Joseph and Job Black in the place of Rebecca's bond. A moment's consideration of some of the leading circumstances from which I draw this conclusion will manifest their strength. The bond of Rebecca Ware has disappeared. The bond to David Ware was drawn by the scriv-

ener who wrote the bond of the wife, upon a like printed form and for the same amount. It contains the peculiar condition that it shall be payable at the death of Martha Hall, and corresponds in date so far as the day and month (March 31st) are concerned, and in the time of the payment of interest, and in the rate of interest to be paid. In short, it is a copy of the bond of Rebecca Ware, except in the name of the obligee and the year in the date. Added to this is the recognition of the bond by the Blacks, Waddington and Rebecca Ware, from its date in 1837 until Martha Hall died in 1872, as the representative of the purchase-money debt. It is true, the conveyance to Waddington in 1849, after the date of the David Ware bond, speaks of the existence of a bond to Rebecca Ware, but no such bond appeared. The fact that then David Ware had been dead for ten years, and that before 1849 Rebecca Ware had receipted in her own name for the interest upon this very bond, shows that the bond intended in that deed is the bond now questioned.

From 1826 to 1837 the bond had been Rebecca's, then her husband reduced it to his possession and made it his property. He died two years later, in 1839, and after that Rebecca had actual custody of his bond, and receipted on it in her own name. After she had so receipted for ten years, Joseph Black conveyed to Waddington, and he then naturally had come to think of the bond as Rebecca's, and hence he so called it in his deed. The deed just mentioned speaks of a bond of John Den. He was the husband of Margaret Hall, one of the vendors of the Blacks and a sister of Rebecca Ware. Evidently Den, after the fashion of David Ware, had reduced his wife's bond to his possession. A vendor's lien is not destroyed by assignment. *1 Lead. Cas. Eq. 289.* Much less should it be destroyed by being reduced to possession by a husband. He succeeds to it by virtue of a legal right to substitute himself for his wife in the ownership of it. The taking of a new bond simply made evidence of the exercise of this legal right. It could make little difference to Mr. Waddington whether the bond was owned by Rebecca or by David Ware. In either event he had $400 to pay, for he had ample

notice and knowledge that that amount of purchase-money remained unpaid. Acting upon this knowledge, he protected himself by withholding from Joseph Black a portion of the purchase-money that he had agreed to pay Black. Such arrangement between the subsequent purchasers did not discharge the original vendor's lien. For a time Waddington paid interest to Joseph Black, and Joseph Black paid interest to Rebecca Ware, but this roundabout procedure was soon abandoned and Waddington paid directly to Rebecca Ware. Finally a payment was made to Black's executor expressly to settle three of the Hall bonds, and among them the Rebecca Ware bond. It is very plain that such a payment would not discharge the Ware lien. The executor of Joseph Black had no authority to receive payment for the administrator of David Ware. I need not settle whether such a payment was in fact made, for if it was, and the money was misappropriated by the executor, the loss must fall upon Mr. Waddington, who selected the executor as his agent to cancel the Ware bond.

When Rebecca Ware joined in the deed to the Blacks all that she conveyed was the plot numbered one, which had been set off to her in the partition of her mother's farm. Hence the lien now sought to be established must be confined to that plot.

I will decree that the complainant has a lien upon the plot numbered one for $400, with interest from March 25th, 1872, and will order the plot to be sold to raise and pay that amount, together with the complainant's costs.